Matter of Addy J. (2004 NY Slip Op 51642(U))

[*1]

Matter of Addy J.

2004 NY Slip Op 51642(U)

Decided on December 13, 2004

Family Court, Monroe County

O'Connor, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 13, 2004

Family Court, Monroe County
In the Matter of Addy J., Mark J. AND Adam S. Children Neglected by D. J. and A.M., RESPONDENTS.
In the matter of the Review of the Foster Care Status of Zelda S. AND Rosalind S.
NA 461-01/04D

Lori Ann Ricci, Esq., Deputy County Attorney, of counsel
Eftihia Bourtis, Esq., for Adam S. and M.J.
Mary Beth Feindt, Esq., for Zelda S.
Rekha Jain, Esq., for Rosalind S. and Addy J.
Anthony Leavy, Esq., for Respondent D. J., mother
Brian J. Wirley, Esq., for T. J., interested party

Marilyn L. O'connor, J.

Monroe County Department of Human and Health Services filed a petition under Article 10 of the Family Court Act on January 9, 2004, to extend the neglect order against D. J., mother [*2]regarding four of the children Max, Mark, Adam, and Addy.[FN1] The other two children, Zelda and Rosalind, had been voluntarily placed by the mother with the Department. Thus, Monroe County Department of Human and Health Services also filed a petition under Social Services Law, § 392, to review the foster care status of the two girls and the proposed permanency plan, and to determine whether foster care should be continued.
Guardianship, expressly subject to the neglect order, was recently granted to the children's aunt Beverly J. of Georgia for all but Max. On November 15, 2004 the neglect order was terminated as to Max, a PINs order regarding him was withdrawn by the Department and dismissed, as Max was being held on a criminal matter and the Department no longer had any ability to help Max (S 04778-03).
A temporary extension of the neglect order was granted while this decision was pending. The 2003 and 2004 foster care reviews for Rosalind and Zelda were also temporarily extended, pending resolution of various proceedings involving the six children at issue here, including the above-mentioned guardianship petition of the children's Aunt Beverly J., a nurse who resides in Georgia.
The children's Aunt Beverly was granted guardianship of all the children, except Max, by order of this Court dated August 23, 2004 (G09701/05-03). Said order was made expressly subject to the neglect orders. Additionally, Zelda and Rosalind could not be ordered to Georgia immediately, due to a roadblock created by the Interstate Compact for Placement of Children when Georgia refused to take any of these children except Addy, who already resides with Aunt Beverly in Georgia. Georgia's duly designated representatives working pursuant to the Interstate Compact for the Placement of children found that placement with Aunt Beverly would be contrary to the interests of the children other than Addy. The children's mother, father and Aunt Beverly disagree. The Monroe County Department initially recommended that Adam and Mark (in addition to Addy) be allowed to live with Aunt Beverly. Upon the ICPC re-application, made once the guardianship was granted, the County took no position. To date, no response from Georgia has been received on the re-application.
THE POSITIONS OF THE PARTIES
The children's mother, D. J., now seeks to have all the children (except Max) reside with their aunt, Beverly J., in Georgia. To this end, her attorney asked that the neglect order not be extended with respect to Addy, Mark and Adam and that the foster care of the two girls, Zelda and Rosalind, not be continued. (T. J., father of the children at issue, is not a party to the above-captioned proceedings, he has appeared and supports Aunt Beverly having guardianship of the children.)
There is no dispute as to where Addy, age 15, should live. Addy is already successfully living with Aunt Beverly with ICPC approval, and she wishes to remain there. Her law guardian offered no position on whether the neglect order should be extended with respect to her.
Mark J., age 13, and Adam S., age 12, are currently in foster care and wish to live with their Aunt Beverly. According to their law guardian, they wish to move after the current school [*3]year. Their law guardian supports a move to Georgia for the two boys. Though she has concerns, she believes that the alternatives here in Monroe County are worse. She did not state her position with respect to the extension, per se, though her position would appear to be that the extension be granted only through the end of the school year and that the boys thereafter be moved to Georgia with Aunt Beverly.
Zelda S., age 11, was in a successful foster home at the time of the hearing and wished to be adopted by that foster mother, who was willing to adopt her and approved by the Department for adoption. Zelda's law guardian advocated that her extension be continued so that she could stay in her current placement and ultimately be adopted by her current foster mother.
Rosalind S., age 8, was in an emergency bed at a group home at the time of the hearing. She wants to live with her Aunt Beverly according to her law guardian. Her law guardian requested that the court deny the relief requested by the county, dismiss the placement petition and allow her client to live with her Aunt Beverly J., "where she is wanted." She wrote in part,
My client has lived at Hillside or through Hillside for more than one year. She has indicated several times that she would like to live with her aunt Beverly J.. It [is] my position that my client should be given a chance to live a life with her family members and not to be with people who do not want her. My client was removed from two foster homes at the request of the foster parents. [The] County's goal is for adoption of my client. [The] County has been unable to find a suitable foster home for my client, how will they find a family who is willing to adopt my client[?]"
The Department wants the children to continue in foster care in Monroe County, with a goal of adoption, except for Addy, for whom the goal is residing with a relative resource (i.e., Aunt Beverly). Of the five children, only Zelda has a pre-adoptive home.
TESTIMONY
There was only one witness, Patricia Turek, child protective caseworker with the Monroe County Department of Human and Health Services, who was assigned to the above-captioned cases in July of 2002. She testified as to the status of the children. She explained that Max was AWOL, and because he is no longer involved in this case, her further testimony as to him is irrelevant. Much of Ms. Turek's testimony cannot be given any weight because she relied heavily on the opinions and recommendations of the sex abuse therapist who was denied expert status by this court. The following facts are found based on the testimony of Ms. Turek.
The three girls, Addy, Zelda and Rosalind came into care in April of 2000 and Mark and Adam came into care in September of 2001. Both parents are covered by the service plans for the children, but only the mother is a respondent. The children's Aunt Beverly has been awarded guardianship of these five children. The respondent mother became clean and sober but stopped working with the TASA counselor and did not engage in family counseling. She had stated to Ms. Turek that she loves her children and wants to remain in contact, but is not ready for their return. She visits them regularly, as does their father.
Addy, who was living with Aunt Beverly, was doing very well in school in Georgia, had many outside activities, and received independent living skills from the Georgia Department of Social Services. The department wanted an extension of her order, which would continue the services she is receiving in Georgia. The Department's permanency plan was to remain with a [*4]relative resource.
In contrast, Mark, a seventh grader in the Rochester City schools, had recently been suspended, was in a special program but a regular classroom, receives TASA and individual counseling services, receives extra help for testing, and takes medication for ADHD. Adam, also in the Rochester City School District, was in a special 8:1 ratio classroom, on medication for ADHD, was diagnosed with PTSD and anxiety, and receives TASA and individual counseling. Zelda was in grade school in the Rochester City School District, was doing well, was in a regular class, takes medication for ADHD, and receives TASA counseling. Rosalind was in an emergency group home through Hillside after threatening to kill the family and the children in a respite home one day and threatening to kill her foster mother's grandchildren the following day. She was in a special education class due to emotional disturbance and received appropriate counseling. At the time of the hearing, another diagnostic work-up was underway. Mark and Adam had been sexually abused by a Mr. M. more than three years earlier. No particular inappropriate behavior by them toward their female siblings was established, though the girls reported unspecified "inappropriate behavior". The implication was that this "inappropriate behavior" was sexual in nature, but the witness could not even say if it was and had no further facts to support her conclusions of any inappropriate behavior. This part of Ms. Turek's testimony was highly prejudicial because of its unsubstantiated sexual misconduct implications which relied on the sex therapist's non-expert testimony.
 The four children, other than Addy, had had the same sex abuse counselor from the very beginning of services being provided and also had private counselors. Aunt Beverly had informed Ms. Turek that she believed she was capable of locating and providing appropriate services for all the children. There was no contrary evidence. (See guardianship decision, dated August 23, 2004, supra, regarding her qualifications.)
The five children had visitation with Aunt Beverly for about10 days before school started in September, 2004. Unfortunately, during that time, the children's older brother Robert (who lives in New York) arrived at Aunt Beverly's home unannounced. He stayed there during the entire visit, despite Aunt Beverly's unsuccessful efforts to get him to go away.[FN2] Aunt Beverly knew he was not supposed to be there when the other children were there, and she failed to tell the Department or the Georgia caseworker that he was there during the visit. The boys all slept in the same room and Aunt Beverly lost a lot of sleep waking up to make sure "nothing was going on". She slept in the same room as the boys according to Mark and Adam. Nothing inappropriate occurred during the visitation.
Also during visitation, an issue was raised about the sleeping conditions and the possibility that one of the children slept on the floor. When the Georgia caseworker visited the home once during the visit to Aunt Beverly's, she said she was not allowed to see the entire house. There was no claim that she had authority to see the entire house. She did see Addy's bedroom and the room the two boys would have if they moved to Aunt Beverly's. The visit had to be scheduled around Aunt Beverly's work, and it appeared that the children were left under the supervision of Aunt Beverly's mother, their grandmother, during at least a significant portion of [*5]their visit but that the grandmother was mobile and able to manage, despite her illness.
DISCUSSION AND RULING Of the five children at issue herein, at the time of the hearing Monroe County was only successfully taking care of one Zelda and was failing 3 others. Aunt Beverly of Georgia was also taking care of one Addy successfully. Though Aunt Beverly could have handled the late summer visitation better, there was no evidence that anything bad happened as a result of Robert's presence. There was no evidence of any other significant problem or any negative impact on the children. Accordingly, and as explained further below, some changes are appropriate in an effort to find a successful way to handle all the children not just two of them.
Zelda: The foster care status of Zelda, who is successfully living in a pre-adoptive home and wants to be adopted by her current foster mother, should be extended for 12 months. This is in her best interests. The Department has made reasonable efforts to return Zelda to respondent, but those have not yet been successful. The Department's permanency plan goal of adoption is approved. However, adoption could be by a fit and willing relative or a foster parent. A change for Zelda will be that liberal holiday and summer visitation with Aunt Beverly shall be ordered. This will provide her at least temporarily with a family composed of blood relatives—something she has not experienced for more than four years, except for the one brief court-ordered visit. It will also create sibling visitation for Zelda and provide Zelda with an additional possibility of seeing her parents under the supervision of Aunt Beverly. This entire arrangement should suit her best interests and give her an opportunity to re-consider her long-term future with more facts and more experience than she currently has.
Addy: The neglect order shall not be extended as to Addy, who already resides with Aunt Beverly pursuant to the Interstate Compact for Placement of Children and is doing fine. The Department's permanency plan for Addy is to be placed with a fit and willing relative on a long-term basis. That has been accomplished, by the guardianship and the Department's placement of Addy with Aunt Beverly. Supervision is no longer needed. This is in her best interests, as clearly indicated by all parties agreeing she should reside with her aunt.
Mark and Adam: The existing neglect order shall not be extended for an additional 12 months for Mark and Adam. A denial of the extension is in their best interests. Instead, they shall be released to Aunt Beverly, their legal guardian as chosen by respondent and approved by this court. Aunt Beverly is a suitable relative to have care and custody of the boys and they desire to live with her. They shall be transferred to her care and custody, at the Department's expense, as soon as Aunt Beverly makes arrangements to bring them to Georgia. Aunt Beverly is an individual who is uniquely well-suited to meet the needs of these children. She is educated, resourceful and willing. The Department shall be required to cooperate so that there is a smooth transition, and the temporary extension now in place shall continue only until that transition is physically made, and shall thereafter be terminated and the neglect extension petition dismissed. The Department's permanency goal for Mark and Adam is adoption. This goal has been proven completely unrealistic and inappropriate for judicial approval as the Department has not even been able to find stable, long-term foster care for these boys. Being with their aunt, in a family of blood relatives, after foster care has failed them for several years, would among other things allow them continued contact with their parents, who visit them and want continued contact. It is the conclusion of this court that this would serve their best interests. The court has considered [*6]extending only through the school year for the boys, but has concluded that a transfer must be made even here in Rochester and it is better to put them in a home where they are wanted quickly rather than place them in yet another foster home where they probably will not be wanted, even though this requires a mid-school year transfer.
 Rosalind: The most compelling case for immediate change is Rosalind. Placement with Aunt Beverly is particularly important for Rosalind since the little girl wants this and desperately needs effective, nurturing care which the Department to date has been unable to provide. The risks for Rosalind, now age 9, who has already exhibited suicidal behavior, are immense. It is also apparent that such issues as "parentification" could well disappear if a competent parent-figure, such as Aunt Beverly, heads the household where the children live. The Department's goal for Rosalind is adoption, but it has not been able to find her even stable foster care, let alone a permanent home. It is undisputed and undisputablethat she needs a permanent home. She has been bounced from place to place foster home, Hillside, therapeutic foster home, and finally a group home emergency bed at the time of the hearing with a new evaluation pending to determine what kind of care she needs. She has recently threatened the lives of several others, adults and children. More than 4 years have passed with her in the care of the Department and she has apparently deteriorated under its care. It is impossible to conclude that more of the same is in her "best interests" or that a continuation of the counseling that has brought her this far is necessary for her well-being.
It could be that Rosalind will thrive if allowed to live with Aunt Beverly. It could be that she will be only a little better off than she has been to date with the Department's interventions here in Monroe County. However, Rosalind deserves a chance to be wanted and to have her desire to be with a family member honored since "the system" to date has failed her dismally. The continuation of foster care requested by the Department will not be approved for Rosalind as it would not be in her best interests. Instead, this court will direct that Rosalind be placed in the care and custody of Beverly J., her Aunt, in Georgia, and the petition will be denied and dismissed. For Rosalind, time is of the essence. The more quickly she can be transferred to Aunt Beverly's home, the better. Rosalind's transportation to Georgia shall be paid for by the Department. Visitation shall be as arranged by Aunt Beverly as her guardian. INTERSTATE COMPACT 
Despite the Department's contention that placements with Aunt Beverly violate the Interstate Compact for the Placement of Children since Georgia as the receiving state has not accepted the children by finding placement there would be in their bests interests, it is this Court's determination that these placements with the guardian and aunt, Beverly J., would indeed be in their best interests. Moreover, it is the Court's conclusion that such placement would not violate the Interstate Compact for the Placement of Children (ICPC) under the circumstances of this decision. Article VIII provides, "This compact shall not apply to: (a) The sending or bringing of a child into a receiving state by his parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or non-agency guardian in the receiving state." (Emphasis added.) It is this court's position that once the extensions in the neglect case are denied herein, so that Mark, Adam and Addy are no longer in the custody of the Department, the placement is by an aunt and guardian with that aunt and [*7]guardian. Thus, it is outside the ICPC even though the children will move to Georgia. Similarly, regarding Rosalind, it is this court's determination that since this court is denying the continuation of foster care for Rosalind, the authority of her legal guardian takes over. She can be placed by her aunt and guardian with her aunt and guardian, outside the ICPC, in Georgia. The court recognizes that where this is a legitimate alternative to foster care found by the mother, the ICPC can be properly rendered inapplicable under its own language which excepts transfers to close relatives and legal guardians from compliance with it.
NOW THEREFORE, for the reasons set forth above, and after examination and inquiry into the facts and circumstances of the case and into the surroundings, conditions and capacities of the persons involved, and after hearing the proof and testimony, the Court finds and determines as follows:
Best Interests Findings:
FOUND that the return of the children to their mother's residence would be contrary to the bests interests of the children because Zelda, Addy, Mark, Adam and Rosalind would be at risk of abuse or neglect if returned to the mother due to D. J.'s need to further address issues related to substance abuse, parenting, and mental health; this determination is based on the petition filed January 9, 2004, and the evidence heard on October 8 and 13, 2004; and it is further
Reasonable Efforts Findings:
FOUND that reasonable efforts, where appropriate, to return the children home safely were made as follows: D. J. has been offered services to address substance abuse, parenting and mental health issues, as well as visits with all the children; this determination is based upon the petition filed January 9, 2004, and the evidence heard on October 8 and 13, 2004; and it is further
FOUND that reasonable efforts were made to finalize the permanency plan of adoption for Zelda, as Zelda was sent to visit her Aunt Beverly and sister Addy, who is in Aunt Beverly's care, to see how that affected Zelda's wishes and her residency with her foster care mother was monitored; and it is further
Findings Regarding Alternatives to Foster Care
FOUND that based upon the investigation conducted by the Monroe County Department of Human and Health Services, Division of Social Services, the testimony heard in the guardianship hearing (G09701/05-03), and the testimony heard in the hearing in this matter, the children's aunt and legal guardian Beverly J., is a suitable person and relative with whom all the children could appropriately reside and Mark, Adam, Addy and Rosalind wish to reside with her, she wishes to have them reside with her, and the children's parents want the children, including Zelda, to reside with her; however, because Zelda is living in foster care with a potential adoptive parent and wishes to be adopted, it may not be in her best interests at this time to remove her from that home; additionally, more time is needed with Zelda having visitation with her aunt Beverly J. and her siblings in order to determine what is in Zelda's long-term best interests; and it is further
[*8]
FOUND that it is in the best interests of Mark, Adam, Addy and Rosalind to reside with their aunt and legal guardian Beverly J., and Mark, Adam and Rosalind should move in with Beverly J. promptly; and it is further
Domestic Violence
FOUND that domestic violence is not known to have occurred in the children's home; and imminent risk to the children would not be eliminated by the issuance of a temporary order of protection or other order of protection directing the removal of D. J. from the children's residences;
NOW, after examination into the facts and circumstances and after hearing the proof and testimony, and temporary extensions and continuances having been previously granted until further order, it is
ORDERED that the foster care extension petition is denied and dismissed as to Mark J., Adam Sabee (a/k/a S.), and Addy J. and these children are discharged to the care and custody of Beverly J., legal guardian, and it is further
ORDERED that foster care of Zelda S. is continued for a period of up to one year and the petition is dismissed as to Rosalind S. and the child is discharged to the care and custody of Beverly J., legal guardian; and it is further
ORDERED that the Petitioner shall promptly, in cooperation with Beverly J., and at the Petitioner's expense, arrange for the transfer of Mark, Adam, and Rosalind to the care and custody of Beverly J., legal guardian, in Georgia; and it is further
ORDERED that the Petitioner's permanency plan for Zelda, adoption, is approved; and it is further
ORDERED that the Petitioner shall arrange for Zelda to visit Beverly J. and Zelda's siblings residing with Beverly J. during holidays and school vacations, with such visitation to consist of at least two weeks during the summer, one week at Christmas time and one week during another school recess (e.g., February break or April break), with the specific dates to be selected in consultation with Beverly J.; and it is further
ORDERED that the Petitioner shall provide the respondent/parent with visitation with Zelda at least once each month; and it is further
ORDERED that Petitioner shall make a progress report to the Court, the parties and the law guardian on the implementation of this order not later than 90 days from the date of this order and every 60 days thereafter, except that a separate report 60 days prior to the expiration of the placement is not required if a permanency petition is filed at that time; and it is further
[*9]
ORDERED that if the child Zelda remains in foster care, Petitioner shall file a petition for the next permanency hearing no later than April 29, 2004 and the permanency hearing shall be completed by June 28, 2005.
DATED: December , 2004_____________________________
Rochester, NYHON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE
NOTICE: Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.
MAILED OR HAND-DELIVERED: Lori Ann Ricci, Esq., Eftihia Bourtis, Esq., Mary Beth Feindt, Esq., Rekha Jain, Esq., Anthony Leavy, Esq., Brian J. Wirley, Esq.
Footnotes

Footnote 1: The original neglect order was issued after D. J.' friend, A. M., consented to a finding that he had sexually abused the children and to a permanent order of protection. T. J., father of some of the children, was not a respondent. 

Footnote 2: Robert has never been charged with any misconduct connected with the children even though there is much "speculation" about him.